## PICKERING vs. PICKERING.

| 15 | 281 |
| 67 | 33 |

A provision in a will, " that if either of my said daughters shall be distressed, and come to want, and be unable to support themselves, then my will is, that she or they be maintained, in a decent and comfortable manner, out of the income and profits of the whole of my real estate," constitutes a legacy or bequest, charged upon the income of the real estate, and through that upon the whole of the land itself; and on the happening of the contingency, the maintenance is chargeable upon such income, in the hands of any one to whom the land may come.

The land being devised to several persons jointly, an implied promise arises on the part of the devisees, accepting the devise, to appropriate the income to the support of the daughters, or any of them, on the happening of the contingency while the devisees hold the land.

Should the income not be sufficient for the support of all the daughters who may need, it must be apportioned.

The devisees taking jointly, the implied promise is joint.

Where there is an implied promise by a devisee to pay a legacy charged upon the land, an action will lie against his executor or administrator for any breach in the time of the devisee, and perhaps for a subsequent breach, if the legacy is given in such a manner that it constitutes *debitum in presenti*.

If the charge upon the land be of a gross sum, payable presently, or at a future day, a conveyance of the land would neither discharge the land nor discharge the devisee from his implied promise to pay the debt. No personal promise of the grantee would be implied, but he would take the land charged with the duty.

Where the charge depends upon a contingency, as for instance where the legacy is charged upon the income of the land, in case the legatee shall be in need, the implied promise, on the acceptance of the devise, extends only to an appropriation of the income, if the contingency happens while he holds the estate. The law raises no implication of a promise beyond the time that he will have the ability to perform it, and the estate he takes is assignable.

*It seems* that in such case, upon every transfer of the whole estate, the grantee who takes the estate, charged with a duty which is to be performed upon a contingency, or a continuing duty which does not constitute a debt, or a duty which occurs from time to time, might be held, by implication, to promise performance of the duty, or payment of the charge, which accrues in his time, and that his personal representatives might be chargeable for his default.

But where the devisee or devisees sell the estate in parcels, at different times, (although any one of the grantees might perform the duty, or make the payment, and have his remedy for contribution,) upon ordinary principles of law, neither could exonerate his land by performing or paying a *pro rata* proportion, nor could a several promise of performance of the whole duty be implied.

If a joint promise, upon which an action at law may be sustained, can be implied, it must be of such a shifting character, upon the happening of subsequent

sales, as to show that it can only be raised from the necessity of the case, for the sake of a remedy. No such implication can be raised if the legatee can have any other relief; and the appropriate remedy is in equity, where equitable jurisdiction over the subject matter exists.

The duty devolving upon the holders of the land, in this case, would be performed by an appropriation of the income, or so much of it as is necessary, at a reasonable place, by either of them. But an offer of support by a devisee who had parted with his title, and was not liable, would not bar the remedy.

ASSUMPSIT, in favor of Temperance Pickering, against Sally Pickering, Gilbert Pickering Hoyt, James Pickering, Winthrop Pickering and John L. Pickering.

The declaration set forth that one Winthrop Pickering, of Newington, being seized of a large real and personal estate, on the 22d day of January, A. D. 1783, made his will; and thereby, after certain other legacies, devised all the residue of his estate to his three sons, Absalom, James and Gilbert, and their heirs, equally to be divided between them.

That the testator by said will ordered and directed, that, if it should so happen that any or either of his daughters named in said will should be distressed, or come to want, and be unable to support themselves, that she or they be maintained in a decent and comfortable manner out of the income and profits of the whole of his real estate, during her and their natural lives.

That the testator, on the 19th day of June, A. D. 1783, died seized and possessed of a large real and personal estate, more than sufficient to pay his debts and the legacies bequeathed by his will.

That on the 26th day of August, A. D. 1783, the will was proved, and the said Absalom, James and Gilbert assented to the devise made to them, and entered into and became seized of the land and subject to the charge aforesaid.

That James, John L. and Winthrop Pickering, (three of the defendants,) became seized and possessed of part of the lands devised to Absalom, James and Gilbert, by descent and purchase.

That Sally Pickering, one of the defendants, became seized and possessed of a life estate in a part of the lands, and became entitled to a portion of the yearly income and profits of a part of the lands devised as aforesaid by the devise of said Gilbert Pickering.

That Gilbert Pickering Hoyt became seized of a part of the lands devised, by the devise of said Gilbert Pickering, and the defendants now hold the same subject to the charge aforesaid.

That the yearly income and profits of the whole of the real estate are more than sufficient to maintain the plaintiff in a decent and comfortable manner.

The declaration then alleged that the plaintiff was a daughter of Winthrop Pickering, named in his will; that since the 17th day of April, A. D. 1839, she has been unable to support herself; at which time, and at sundry other times, she gave notice to the defendants that she was distressed, and had come to want, and was unable to support herself, and should hold them chargeable for her maintenance in a decent and comfortable manner out of the income and profits of the whole of said real estate; that she was entitled to have the sum of $200.00, being the sum necessary for her support from said 17th day of April, A. D. 1839, to the date of the writ, out of the income of the whole of said real estate. By force whereof, &c., the defendants became liable, &c.

John, James and Winthrop Pickering severally pleaded the general issue. Sally Pickering and Gilbert Pickering Hoyt were defaulted.

Upon the trial, it appeared in evidence that Winthrop Pickereng, by his will dated on the 22d day of January, A. D. 1783, and proved on the 26th day of August, A. D. 1783, after bequeathing to each of his seven daughters, of whom the plaintiff is one, a cow, to be delivered them on the day of their marriages respectively, made a devise in the following words:

"If it shall so happen that any or either of my said daughters shall be distressed, and come to want, and be unable to support themselves, then my will is that she or they be maintained in a decent and comfortable manner out of the income and profits of the whole of my real estate, during her and their natural lives."

The testator then devised all the rest of his estate to his three sons, Absalom, James and Gilbert.

Gilbert Pickering, one of the devisees of Winthrop, by his will, made in the year 1831, devised to Sally Pickering, one of

the defendants, his dwelling-house, one half the barn, and one half the income of the farm during her life. And he devised to Gilbert Pickering Hoyt all the residue of his estate.

Absalom Pickering, another of the devisees of Winthrop, by his will, made in the year 1834 and proved in 1835, devised to James Pickering, one of the defendants, twelve acres of land on the west side of the road from Piscataqua bridge to Greenland, a certain school-house, and his personal property; he also devised to John L. Pickering, one of the defendants, twelve and a half acres of land east of said road, and twenty-six acres in a swamp pasture.

Winthrop, James and John L. Pickering, three of the defendants, are sons of James Pickering, one of the devisees of Winthrop.

In the year 1839, Sally Pickering and G. P. Hoyt occupied one third of the old Winthrop Pickering farm, the share of Gilbert Pickering.

James and John L. Pickering occupied one third the share of Absalom. On the 28th of June, 1823, James Pickering conveyed to Winthrop Pickering his interest in the estate of James Pickering.

Winthrop Pickering occupied one third, being the whole of his father's estate.

The defendants proposed to show that in the year 1783, at the time of the death of Winthrop Pickering, the real estate which he left would not yield sufficient income to support the plaintiff, after paying the expenses of carrying it on, and that the value of it had been increased by the betterments and expense paid and expended upon it by the persons who had occupied it since that time; but the court considered the evidence inadmissible, and ruled that the defendants must confine their evidence to the value of the income and profits of the whole of the real estate of which the testator died seized, on the 17th day of April, A. D. 1839, when the plaintiff made the demand upon the defendants for her support. It was then admitted by the defendants, that on that day the income of said real estate was more than sufficient to support the plaintiff.

In the year 1835, the selectmen of Newington having been called upon to support the plaintiff, one of the selectmen called on James Pickering, one of the defendants, for her support. He desired the selectmen to inform the plaintiff that if she would come to his house, or to the house of Winthrop Pickering, she should be supported as well as they lived themselves; and this message was delivered to the plaintiff. It appeared also in evidence that, at about the same time, Winthrop Pickering told the plaintiff that she might come to his house, (which is the old Winthrop Pickering house,) and stay as long as she pleased, and he would carry her back to the house where she then lived whenever she desired. The witness who stated these offers of Winthrop Pickering testified, however, that he did not understand this proposition made by Winthrop as a proposition that the plaintiff should come and live with him, but an invitation to her to come and make him a visit. It was in evidence that Winthrop Pickering lived as comfortably as any of his neighbors. In relation to the question whether the plaintiff had come to want and was unable to support herself, it appeared that she was now eighty-two years of age, that her health was poor, and had been so for some years; that she had been unable to do any household work for some years, or to be of any assistance in a family; that she was unable to sew or to knit, and could sit up only part of the day; that she once inherited a little property from an uncle, the whole of which she had been obliged to expend for her support, previous to 1839 and as early as 1835 or 1836, and that those who now occupied the land of which her father died seized had never either called to see her or furnished her any support.

About fifteen years ago, William Hoyt moved from Portsmouth to Newington, and occupied the house where the plaintiff and her sister Rosamond lived. About forty acres of land were occupied with the house, and they kept two cows, but the land did not yield hay enough for them, and they were obliged to purchase some. The neighbors used occasionally to assist them about their household work. William Hoyt was a day laborer, and had a wife and two children, and he carried on the land, which contained a small portion of arable land, some pasturing, and wood-

land.   When he came to Newington he brought with him a small quantity of provisions and some household furniture.   Rosamond Pickering testified that they did not suffer for want of the necessaries of life either before or since William Hoyt came there ; that she never found fault, and always meant to be contented with her lot.

It appeared that the plaintiff had occasionally in the course of the summer walked a short distance, aided by some one to walk with her and support her.

On the 17th of April, 1839, a notice was served upon each of the defendants, except James Pickering, who was absent, and a copy was left at his house, in the following words :

"Newington, 17 April, 1839.   To (A. B.) &c.   We the undersigned, suppose you a claimant to a part of our father's estate, the income of which we consider to hold for our maintenance from date so long as we may live."

(Signed,)    Temperance Pickering,<br>
Hannah Pickering, (since dead,)

and witnessed by two witnesses.

It was submitted to the jury to find what sum would be sufficient comfortably and decently to support and clothe the plaintiff from the 17th day of April, 1839, to the 29th of January, 1842, (the date of the writ,) and they returned the sum of $231.00, and a verdict was taken for the plaintiff for that sum.

The defendants moved to set aside the verdict, and took the following exceptions.

1. Because the court excluded evidence of the value of the real estate at the death of Winthrop Pickering, and of the betterments and increased value given it by the defendants, or those who had occupied the land since the death of Winthrop Pickering, and ruled that the defendants must be confined to the value of the land on the 17th day of April, 1839.

2. That the provision in the will of Winthrop Pickering, for the benefit of the plaintiff and his other daughters, and for which this suit is brought, is not a legacy charged upon land.

3. That an action of assumpsit cannot be maintained for such a legatee as the plaintiff.   If any action is maintainable, it is an action on the case.

4. That assumpsit cannot be maintained against the defendants jointly; that they are not jointly liable, owning in different proportions the real estate that belonged to Winthrop Pickering, the testator, and by different conveyances or titles, commencing at different times.

5. That James, Winthrop and John, having offered to support and maintain the plaintiff at the house of either James or Winthrop, (Winthrop living in the house and upon that part of the farm occupied by Winthrop, the testator,) no action can be sustained by the plaintiff against them.

6. There is a variance between the declaration and the proof; the declaration not being full enough to admit the proof.

7. The verdict is rendered against the defendants jointly, and for the whole support of the plaintiff; but James, John and Winthrop, if jointly liable, as the plaintiff has alleged, should be placed in a situation where they would not be liable to pay more than three fifths.

*J. W. Emery*, (with whom were *Cutts* and *Christie*,) for the defendants. 1. An action of assumpsit cannot be maintained for a legacy like the present. If any action at law is maintainable, it is an action on the case. 5 *D. & E.* 690, *Deeks & Wife* vs. *Strutt*; *Hob. R.* 265, *Edwards* vs. *Graves*; 1 *N. H. Rep.* 217, *Erickson* vs. *Willard*; 2 *N. H. Rep.* 439, *Piper* vs. *Piper*; 6 *N. H. Rep.* 120, *Pickering* vs. *Pickering*.

By the constitution, art. 90, " All the laws which have heretofore been adopted, used and approved in the province, colony or state of New-Hampshire, and usually practised in the courts of law, shall remain and be in full force until altered and repealed by the legislature," &c. *Rev. Stat.* 39. No alteration in the law, as declared by the provincial act of *Anne*, has been made by the legislature. The act referred to was passed in the 3d year of *Anne* (1705,) by the assembly of the province, and may be found in the *Prov. Laws*, (*Ed. of* 1716,) *page* 42; (*Ed. of* 1771, *page* 46.)

2. The legacy sued for is not a legacy charged upon the land, but only upon the income and profits thereof. *Ward on Lega-*

*cies* 231; 1 *Vern. R.* 104, *Anonymous;* 1 *Bro. C. C.* 311, *Lingard* vs. *Earl of Derby;* 2 *P. Wms. R.* 14, *Ivy* vs. *Gilbert;* 3 *P. Wms.* 1, *Mills* vs. *Banks;* 2 *P. Wms.* 659, *Evelyn* vs. *Evelyn;* 1 *Sim. & Stuart* 276, *Warter* vs. *Hutchinson; Fonblanque's Eq.* 447, (*Ed. of* 1831, *in one vol.,*) *note;* 2 *Atkyns' R.* 105, *Ridout* vs. *Earl of Plymouth; Cases collected in note to* 1 *Powell on Devises* 233.

3. The defendants, if liable, are not jointly liable in assumpsit, because they own different estates in the property, in different proportions, by different titles, acquired at different times, and, if liable, are so for unequal sums.   *Ward on Legacies* 332; 1 *Bro. C. C.* 440, *Nightingale* vs. *Lawson;* 2 *Ditto* 243, *Stone* vs. *Theed;* 4 *Ves. jr.* 24, *White* vs. *White; and S. C. on appeal in* 9 *Ves. jr.* 554; 2 *V. & B.* 65, *Allan* vs. *Backhouse.* One of the defendants in this case, namely, Sally Pickering, has only a life estate in one third of the real estate of Winthrop Pickering, the testator.

4. These defendants, John, James and Winthrop, have offered to support the plaintiff at the house occupied by Winthrop, the house where the plaintiff was born, and where she lived and was supported for many years; the house that was the mansion house of the testator.   2 *N. H. Rep.* 75, *Currier* vs. *Currier;* 9 *N. H. Rep.* 201, *Flanders & Wife* vs. *Lamphear.*

5. There is a variance between the proof and declaration.

6. The evidence as to the income, &c., at the time of the death of the testator, should have been admitted.

*J. L. Hayes,* (with whom was *James Bell,*) for the plaintiff. 1. The first question is, whether the provisions in the will of Winthrop Pickering, for the benefit of the plaintiff and his other daughters, and for which this suit is brought, constitute a legacy charged on the land.   4 *Mass.* 634, *Farwell* vs. *Jacobs;* 1 *Story* 376, *Sands* vs. *Champlin.* The words of the testator in this case constitute an express charge upon the lands devised by him. Where it appears from the whole will that it was the intention of the testator that legacies and debts should be paid out of an estate,

Pickering *v.* Pickering.

they should be a charge upon the estate. 1 *Atkyns* 573, 4, *Miles* vs. *Leigh ; Viner's Abr., Charge, D, pl.* 21 ; 3 *Mason* 178, *Gardner* vs. *Gardner ;* 1 *Freeman's R.* 192 ; 1 *Vernon's R.* 411, 386, *Cloudsly* vs. *Pellham ;* 1 *Merivale's R.* 240, *New-man* vs. *Kent ;* 12 *Mod.* 242 ; 3 *Cowen* 133, *Kelsey* vs. *Deyo.*

2. Was an action of assumpsit properly brought in this case against these defendants ?

The doctrine is stated generally by Chitty : " An action for assumpsit lies for legacies charged on land." 6 *N. H. Rep.* 120, *Pickering* vs. *Pickering ;* 2 *N. H. Rep.* 439, *Piper* vs. *Piper ;* 4 *Mass.* 634, *Farwell* vs. *Jacobs.*

Even in New-York, where a court of equity has always offered a remedy in chancery, actions of assumpsit have been maintained against devisees for legacies charged on the land. 7 *Johns.* 99, *Beecker* vs. *Beecker ;* 10 *Johns.* 30, *Van Orden* vs. *Van Orden ;* 3 *Cowen* 133, *Kelsey* vs. *Deyo.* See, also, 2 *Greenl.* 157, *Haskell* vs. *Haskell ;* 1 *Sumner* 317, *Allen* vs. *McKeen.*

I find in our New-England precedents no forms for declarations against devisees for legacies charged on land, except in assumpsit and debt. *Oliver's Precedents* 131, *et seq.*

If an action of assumpsit for a legacy charged on land would lie against the original devisees, and we think that point is well established, it may be equally maintained against whomsoever holds the land under them. *Ward on Legacies* 175 ; *Atk.* 382, *Wigg* vs. *Wigg ;* 2 *Atk.* 605, *Hills* vs. *Wesley ;* 1 *Merivale* 240, *New-man & Ux.* vs. *Kent ;* 3 *Mason* 208, *Gardner* vs. *Gardner ;* 1 *Story* 376, *Sands* vs. *Champlin.*

3. In the next place, we assert that an action of assumpsit can be maintained against these defendants jointly, and indeed that a joint action is alone maintainable. 2 *Saund.* 116, *Coryton* vs. *Lithebye ;* 2 *Wilson* 423, *The Tunbridge Well Dippers.*

4. The offers made by Winthrop, James and John Pickering are not sufficient to bar the action.

PARKER, C. J. This is a legacy or provision for the plaintiff, charged upon the income of the land, and through that upon

the land itself. The income of the land into whatever hands the land may fall is chargeable with the maintenance of the plaintiff, upon the contingency specified in the will. 4 *Mass. R.* 634, *Farwell* vs. *Jacobs ;* 2 *Pick. R.* 619, *Baker* vs. *Dodge ;* 1 *Paige's Ch. R.* 32, *Birdsall* vs. *Hewlett ;* 7 *Paige's R.* 431, *Harris* vs. *Fly.*

The will, and the acceptance of its provisions, bound the income of the land, and an implied promise arose on the part of the devisees, when they took possession, to appropriate the income to the support of the daughters, or any of them, while the devisees held the land. The case is within the principles laid down in 6 *N. H. Rep.* 123, *Pickering* vs. *Pickering;* and 2 *N. H. Rep.* 439, *Piper* vs. *Piper. See, also,* 3 *Mason's R.* 208, *Gardner* vs. *Gardner ;* 2 *Ld. Raym.* 934, *Ewer* vs. *Jones.*

The cases cited do not appear to have turned upon any provincial statute. An action at law was maintained, there being a duty, and the promise being implied from the existence of the duty. 1 *N. H. Rep.* 232, *Erickson* vs. *Willard.*

If more than one of the daughters should be in need, and the income was not sufficient for all, (a case the testator doubtless never contemplated,) each must have been entitled to a share, by operation of law, upon the devise.

When the devisees all entered, the duty was incumbent on all ; they took jointly, and the promise may well be regarded as joint ; 10 *Johns.* 30, *Van Orden* vs. *Van Orden & a.,* where a joint promise was inferred, there having been part payment. The charge is upon the income and profits of the whole estate.

Such a charge was held in New-York not to be a personal duty charging the executors. 3 *Johns.* 192, *Livingston* vs. *Exrs. of Livingston ;* 7 *Johns.* 99, *Beecker* vs. *Beecker.* It was held there that an action would not lie on an implied promise ; but that if there be an express promise, or evidence from which an express promise may be inferred as part payment, an action will lie. 10 *Johns. R.* 30, *Van Orden* vs. *Van Orden ;* 3 *Cowen* 133, *Kelsey* vs. *Deyo ;* 6 *Cowen* 333, *Tole & Ux.* vs. *Hardy.* That being the case, an action must then be sustained against the executors of the devisee, where there is evidence of an express promise.

And so where it is held that there is an implied promise by the devisee upon his entry upon the land devised, an action must lie against his executors on that promise for any breach in the time of the devisee; and perhaps for any subsequent breach, if the legacy was given in such a manner that it could be considered *debitum in presenti.*

If the legacy was a sum in gross, payable at once, the devisee or devisees would be liable for its payment immediately, and might, if more than one, be jointly charged. If the legacy was payable absolutely, at a future day, there seems to be no objection to holding that the devisee or devisees, by their acceptance and entry, undertake to pay it when it becomes due.

But divers questions arise here. If the legacy is in gross, and the devisee may be charged in assumpsit upon an implied promise, and a cause of action will exist against his representatives in case of his decease, will his conveyance of the land without payment cause a promise to arise on the part of his grantee to make payment? and will the devisee be discharged from his promise on such conveyance? If he conveys to several at different times, will there be a promise by each of the grantees, if any promise arises in such case, and will that promise be joint?

Upon principle, these questions may be readily answered. If the charge be of a gross sum payable presently, there being a debt due from the devisee on acceptance, his conveyance would neither discharge the land nor discharge himself from the implied promise to pay the debt. He could not by his own act relieve himself from the liability he had assumed. Having assumed the payment of the legacy thus charged, it would stand like his debt secured by a mortgage, and there would be no personal promise implied on the part of his grantee. By making the purchase, he would take the land charged with the duty. But there would be nothing in the nature of the transaction to show that he assumed a debt from the payment of which his grantor was not discharged. The transaction would no more imply a promise by the grantee to pay the legacy, than a purchase of property under a mortgage would imply a personal promise to pay the debt charged on it.

There seems to be no difference in the principle, if the debt be payable at a future day. Where the charge depends upon a contingency, and especially where, as in this case, it is to be made effectual by an appropriation of the income at a future period, the case presents itself under a somewhat different aspect. The implied promise which arises in such case can only extend to the appropriation of the income, in case the devisee holds the estate at the time when the contingency happens, and so long as he holds it. The law cannot raise a promise by implication beyond the time that he will have the ability to perform it, and the estate which he took was assignable.

Under such circumstances there would seem to be no insuperable objection, in practice, to holding that, on every transfer of the whole estate, the grantee who takes the estate charged with a duty which may arise upon a contingency, or with a continuing duty which constitutes no debt, or a duty which arises from time to time, makes an implied promise to perform the duty, or pay the charge which accrues in his time; that for all breaches which accrue while he holds the estate, he will be personally responsible. The consequence would be that his personal representatives must answer, in case of his decease, for such breaches; and, if he aliened the estate, the purchaser would take it charged with all sums in arrear, but would not be personally responsible except for causes of action and neglects which accrued after he became the purchaser. Such a case could perhaps be settled in favor of the maintenance of the action, without violating any of the rules which govern actions at the common law. It would be the simple case of an implied promise to perform a duty, arising from taking a conveyance of land charged with such duty, on the same principle that the original devisee of land charged with a legacy, is held, by implication, to promise on the acceptance of the devise.

But a farther question arises, whether this principle can be applied to cases where the devisee or devisees sell the estate in parcels to different individuals, and where the sales have been made at different times. The whole estate being charged with the entire incumbrance, any one might, in such case, perform the

duty, or make the payment out of the income of his part, if sufficient, and have his remedy for contribution. This seems to be a necessary result. The charge being in the nature of a mortgage, the principle which governs in the case of a mortgage would be applicable in this, for neither could exonerate his share by paying a *pro rata* proportion. This serves to show that, upon ordinary principles, a several promise by each to pay or perform *his share*, cannot be implied in such case. If such was the nature of the implied promise, there could be no contribution, as each would be liable for his share alone. There seems to be as little ground for holding that, upon such sale of a part, the purchaser of part can be held by any implication, arising from the purchase, to have made a several promise to pay or perform the entire duty or charge upon the whole land; because the entire charge is not upon his purchase merely, but upon the whole land. The greatest extent of a several implied promise in this case would be a promise to appropriate the income of his part.

The remaining question is, whether a joint assumpsit may be implied under such circumstances. Lord Chief Justice *Holt*, in *Ewer* vs. *Jones*, 2 *Ld. Raym.* 927, cited for the plaintiff, is reported to have said that a devisee may maintain an action at common law against the *terre-tenant* for a legacy derived out of land. The facts upon which the opinion was founded do not appear, and the language may import no more than an opinion that the first *terre-tenant* under the will is liable. But there is a direct authority in favor of the position; *Swasey* vs. *Little*, 7 *Pick.* 296. There, lands were devised to five children, and the estates of each charged with the payment of one fifth of an annuity. The annuity was paid for several years. Parcels of the fifth, devised to one of the sons, were sold by order of court for the payment of debts. The sale was subject to the annuity. Creditors of the son severally levied executions on other parts of that fifth, the appraisers in estimating their value taking into consideration the annuity, and the amount in arrear. The administrator of the annuitant brought assumpsit for the arrears against all the purchasers and creditors, and it was held that the action might be maintained, and that the defendants were properly joined.

It is objected by the defendant's counsel, that there is a difference between that case and this, because there the sales and levies were made subject to the incumbrance, but the difference does not seem to be one of principle. The transfers in this case were necessarily subject to the charges, although it was not stated, and the grantees of the land are chargeable with constructive notice of it, as they derive their title under the will creating it. 7 *Paige* 421, *Harris* vs. *Fly.* In the case of *Swasey* vs. *Little* it is said, "The general doctrine is, that where lands are charged, the tenants of the lands are jointly liable. If there is a covenant running with the land, the heirs and devisees of the covenantor are jointly liable to an action for a breach of the covenant, committed in their own time. *Chit. Pl.* 39, 40. So if any one acknowledges a recognizance, or suffers judgment to go against him, and afterwards dies, *scire facias* shall go against his heir and the tenant of the lands ; and, in such case, the heir is only liable, as he is tenant of the land descended to him from his ancestor. 2 *Wms. Saund.* 7, *note* 4 ; *Panton* vs. *Hall,* 2 *Salk.* 598 ; *Proctor* vs. *Johnson, Ib.* 600. And all the tenants of the land must be joined in the suit. And the reason is, because all the lands are jointly bound by the judgment or recognizance. The same reason applies to the case under consideration. All the lands in the possession of the defendants were charged with the payment of the annuity bequeathed to the plaintiff's intestate. And although the defendants are purchasers of portions of the land charged, in severalty, yet all these purchases were made subject to a joint charge of the whole land ; and as the whole land is equally charged, so all the tenants are equally liable, according to their respective portions ; and if one should eventually be compelled to pay the whole, he will be entitled to contribution from the other tenants." 7 *Pick. R.* 330.

But neither of the classes of cases there cited appear to bear very directly upon the question. In the first class, that of covenants running with the land, the action is founded upon the express obligation of the covenantor, by which he bound himself and his heirs, &c. No question arises whether there is a joint implied promise. The heirs and devisees are chargeable on the

Pickering *v*. Pickering.

express covenant of the ancestor or testator, upon a principle similar to that by which several executors or administrators, having assets, are jointly liable upon the bond or promise of the testator·or intestate. They do not promise, upon taking the land, but become liable to perform a promise previously made by one whom they represent thus far. But in *Swasey* vs. *Little*, the subsequent purchasers of part of the land are not held upon the ground that they are bound by the implied promise of the devisee who took under the will, but by their own implied joint promise. The action is upon their own promise.

The other class of cases relates to lands bound by recognizance, where the creditor by *scire facias* is attempting to charge the lands themselves, and not to raise an assumpsit of *terre-tenants*. The *scire facias* is only to have execution of the ancestor's lands in the hands of the heir and tenants. 2 *Saund.* 7, *note* 4.

The opinion in *Swasey* vs. *Little*, notwithstanding the authorities cited do not necessarily sustain it, is entitled to very great consideration, from the known character and standing of the tribunal in which the decision was made ; but it is evidently a case where the court must have acted upon the principle that for every right there is a remedy ; and the legislature, not having provided appropriate chancery powers to enforce the charge upon the land in favor of the plaintiff, the court seem to have been compelled to give a very large construction to a statute providing that any person, having a legacy given in any last will, may sue for and recover the same at common law. In ordinary cases, the provisions of this statute would certainly be satisfied by the maintenance of a suit against the executor, or, if the legacy were charged upon land, by one against the devisee or his personal representatives, with a *scire facias* against the *terre-tenants* holding the land under the devisee, to have execution of the land in default of payment, according to the authorities. 2 *Saund.* 7, *note* 4.

There are, certainly, very formidable objections to the implication of a joint promise charging the *terre-tenants* upon a joint personal promise in such case. If a joint assumpsit can arise in any case by reason of a sale of a part of the lands charged with

a legacy, the promise must change at every conveyance of any part. As often as any tenant of a portion sells the whole, or a portion of his estate, a new party is introduced, as making a joint promisor with those who are already tenants, to perform a matter for which the prior owners were held to have made a joint promise, and so on until the end of the chapter. And those already in, are to be held impliedly as concurring in the promise thus arising, although they have no agency in the sale or any knowledge of it. The new·purchaser comes into a kind of partnership in the old promise, but, unlike other cases of partnership, he ·comes in without consent; and perhaps no one goes out. It certainly must form a kind of shifting assumpsit of a very novel character. Does the promise arise upon the purchase and conveyance of the estate, or is it implied when the money becomes payable? Take the case of an annuity. In the course of the year during which it is accruing, there are several conveyances of parts of the estate. Who are to be charged on this shifting joint promise? Those who held at the beginning of the year, or those who owned at the close? If either alone, what is to be done with those who purchased and sold again within the year? When they purchased, their lands were chargeable with the debt. If there is any promise arising from the charge, they came into the partnership, and it would seem must have made some kind of a promise during the time when the debt was accruing, but will have exonerated themselves from all liability, by their sale before it became payable. There seems to be no way in which to get them all in as joint promisors. A case where the support of the legatee is charged upon the land, and there is a continuing breach, must entitle the party to a new action on every sale, and of course subject those who continue to hold, to an action on a new joint promise every time any of the cotenants pleases to find a purchaser of a fraction, however small.

It is not necessary to pursue this matter. There must certainly be sufficient in the considerations already indicated to show that such a shifting joint promise cannot be supported, so long as any other remedy can be found.

From a remark of Mr. Justice *Story*, in *Sands* vs. *Champlin*,

Pickering v. Pickering.

1 *Story's C. C. R.* 386, he evidently understands that when legacies are charged on lands in this mode, there is no personal charge upon the heirs of the devisee, to whom the lands may descend, and of course there could be none upon his grantees.

The charge being upon the income and the land, and the duty arising from accepting and holding the land, and receiving the income, the promise cannot be understood to extend beyond the period during which the parties held. When they sold, and others entered into the land and the reception of the profits, the charge remained upon the land, and the duty of appropriating the income, when necessary, devolved upon the grantees.

If the devisees had all sold to a single individual, perhaps his implied promise might be substituted. If they had all sold at one time to several grantees, the reason before stated would show that they might all be held on a joint promise. But Gilbert, one of the devisees, conveyed his part by will, and the interest having thus become severed, a joint action can no longer be maintained upon general principles. When his devisees came in, they assumed a duty, and might perhaps be held to have made a several promise, if that was necessary in order to secure the rights of those in whose favor the charge existed. But if several actions were sustained, there must be great difficulty in adjusting through the verdicts of different juries the different portions which each was bound to pay.

It seems perfectly clear, from this examination, that there is no adequate remedy at law in this case, and an action at law is not necessary to the security of the plaintiff and the other legatees. Those who have title to the lands hold them in trust, to appropriate the income, or so much of it as may be necessary, to the support of the plaintiff. It is settled that an executor holds in trust to pay legacies. 1 *Story's Eq.* 555, § 593 ; 2 *Madd. Ch.* 1 ; *Jeremy's Eq. Jur.* 194. The same principle applies where one holds lands upon which, or upon the income of which a legacy is charged. 1 *Vernon* 411, *Clowdsley* vs. *Pelham* ; 3 *Mason's R.* 178, *Gardner* vs. *Gardner* ; 1 *Story's R.* 383, *Sands* vs. *Champlin* ; 4 *Met. R.* 528, *Taft* vs. *Morse* ; 1 *Merivale's R.* 140, *Newman* vs. *Kent* ; 2 *Shower's R.* 38. Sit-

ting as a court of equity, we can enforce the trust and apportion the amount.

As the maintenance is charged upon the income, the duty would be performed by appropriating so much of it as is necessary at a reasonable place. If either of those who hold the land had offered to do this, it would have been sufficient. If more than one had made the offer, and was ready to furnish the support, there might be serious difficulties in adjusting the controversy in the ordinary course of proceedings at law.

The offer shown to have been made by James Pickering, would have been sufficient if he had been liable at that time; but he had conveyed his interest long before, and no duty then rested on him.

The offer of Winthrop Pickering, if it was an offer to receive the plaintiff as a visitor, was not sufficient.

*Verdict set aside.*